UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

————

BRANDON LEE ARNOLD,

               Petitioner,                    Case No. 1:11-cv-840

v.                                         Honorable Paul L. Maloney

CARMEN PALMER,

               Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted in the Kalamazoo County Circuit Court of one count of first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS § 750.520b(1)(a) (person under 13), and one count of second-degree criminal sexual conduct (CSC II), MICH. COMP. LAWS § 750.520c(1)(a) (person under 13). On March 30, 2009, he was sentenced as a fourth habitual offender, MICH. COMP. LAWS § 769.12, to respective prison terms of 20 to 45 years and 8 to 16 years. In his *pro se* petition, Petitioner raises two grounds for relief, as follows:

I.      WAS [PETITIONER] DEPRIVED OF A FAIR TRIAL BY ERROR WHERE DEPUTY SOOTSMAN TESTIFIED THAT POLICE "PRETTY MUCH BELIEVED THAT A CRIME HAD BEEN COMMITTED" AND DETECTIVE MATTISON TESTIFIED THAT THE STATEMENTS OF WITNESSES AND THE "ENTIRE INVESTIGATION" CAUSED HIM TO SEEK CHARGES AGAINST [PETITIONER] WHERE THE ADMISSION OF SUCH BELIEF INVADED THE PROVINCE OF THE JURY?

II.     WAS [PETITIONER] DEPRIVED OF A FAIR TRIAL BY PLAIN ERROR WHERE DETECTIVE MATTISON TESTIFIED THAT "THERE WAS AN INDICATION THAT IT MAY HAVE HAPPENED PRIOR TO THIS INCIDENT AT A DIFFERENT LOCATION," WHERE HE ADMITTED THAT HE WAS NOT "ABLE TO VERIFY ANY OF THAT"?

(Pet., ECF No. 1, PageID.6-7.)  Respondent has filed an answer to the petition (ECF No. 9) stating that the grounds should be denied.  Upon review and applying the AEDPA standards, I find that the claims are procedurally defaulted and are otherwise without merit.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

Petitioner was accused of sexually molesting and anally raping Tony Bell, the 11-year-old son of Petitioner's cousin, Cassandra Lee.  Petitioner was charged with one count of CSC I and one count of CSC II.  A supplemental information was filed charging petitioner as a fourth habitual offender.  Petitioner also was charged in a related case with threatening to kill or injure a witness, malicious destruction of a building less than $200 and malicious use of telephone communication services.  Petitioner was tried before a jury beginning January 13, 2009, and concluding on January 20, 2009.[1]

Tony Bell (hereinafter "Tony") testified that he was eleven-years-old at the time of trial.  (Tr. II, 8.)  He lived at 5610 Grassy Meadows, Apartment D, with his parents, sister and two brothers.  (Tr. II, 12-13.)  Tony shared a bedroom with his brothers; his parents shared another bedroom and his sister had her own room.  (Tr. II, 13.)  Tony testified that when Petitioner came over to his family's apartment on the night of the assault, Tony could tell from the way he was moving that he was drunk.  (Tr. II, 15.)  Petitioner was sitting on the couch when Tony went up to bed in his sister's room.  (Tr. II, 15-16.)  His three siblings went to bed in the bedroom that Tony

---

[1]The trial transcripts will be referred to as follows:
Volume I, January 13, 2009 (ECF No. 13) - "Tr. I"
Volume II, January 14, 2009 (ECF No. 14) - "Tr. II"
Volume III, January 16, 2009 (ECF No. 15) - "Tr. III"
Volume IV, January 20, 2009 (ECF No. 16) - "Tr. IV"

usually shared with his brothers.  (Tr. II, 16.)  Tony woke up at one point because he heard his mother and Petitioner talking loudly, but he fell back asleep.  (Tr. II, 17-18.)  The next time Tony woke up, Petitioner was laying beside him on the floor downstairs and had his "private" in Tony's butt.  (Tr. II, 18.)  Petitioner also touched Tony's private part, which he identified as his "pee-pee." (Tr. II, 19-20.)  Tony was trying to yell, but could not because Petitioner was covering Tony's mouth with his hand.  (Tr. II, 18-19.)  Petitioner was not sure how he got downstairs, but assumed that Petitioner carried him while he was sleeping.  (Tr. II, 19.)  Tony was wearing boxer shorts and a t-shirt that night.  (Tr. II, 24-26.)  Petitioner pulled Tony's boxer shorts down to his knees.  (Tr. II, 26, 32.)  During the assault, Petitioner had his pants down to his knees and his shirt off.  (Tr. II, 27, 38.)  When Tony woke up again, he got up and pulled up his pants.  He looked around and did not see Petitioner, so he covered himself up and went back to sleep on the floor.  (Tr. II, 27-28.)  Tony wanted to tell his mother what happened, but not until Petitioner had left.  (Tr. II, 28.)

On cross-examination, Tony testified that he did not recall telling police officers and a counselor that Petitioner came upstairs to his sister's room and woke him up.  (Tr. II, 32-33.)  Tony really didn't know how he got downstairs.  (Tr. II, 33.)  Tony testified that he told the police officer and Dr. Gushurst about sleeping in the living room.  (Tr. II, 37.)  Petitioner's clothing was off the first time Tony saw him, but he later went and pulled up his pants.  (Tr. II, 38.)  Tony testified that it was hard to remember all of the details because the events had happened a long time ago.  (Tr. II, 39.)

Dr. Philip Pazderka testified that he examined Tony for alleged sexual assault on May 28, 2008.  (Tr. II, 44.)  The examination took place approximately one hour after the assault.  (*Id*.)  Tony appeared detached and quiet.  (Tr. II, 45.)  Tony stated that was fondled and rectally penetrated with a penis.  (Tr. II, 46.)  Tony complained of rectal discomfort, but Dr. Pazderka did not observe

any bruising or physical injury, although it was possible that bruising could have developed later time. (*Id*.) Dr. Pazderka was not surprised by the lack of visible injury. (Tr. II, 47-48.) Dr. Pazderka and the nurse collected the evidence for a sexual assault kit, including an anal smear and hair combings. (Tr. II, 49.)

Cassandra Lee, Tony's mother, testified that she lived with her four children and their father, Tony Bell, Sr. (hereinafter "Bell"), who was her ex-husband. Her sons Tony (age 11), Torrian (age 9) and Travain (age 8) shared one bedroom, her daughter Cameron (age 7) had her own bedroom, and Lee and Bell shared a third bedroom. (Tr. II, 54-55.) Lee testified that Petitioner, who was her first cousin, came over to their apartment on May 28, 2008. (Tr. II, 55.) He was very intoxicated and wanted Lee and her ex-husband to drink with him. (*Id*.) Petitioner left after they refused to drink with him, but came back later and asked to sleep on the couch because his mother would not let him in to their apartment and he did not have a key. (*Id*.) Petitioner and his mother lived in the same apartment complex as Lee's family. (Tr. II, 56.) When Lee went up to bed, Petitioner was sitting on the couch watching TV and the children already were upstairs in bed. (Tr. II, 99.) After Lee went upstairs, Petitioner came up a couple of times to speak to her. After each conversation, she closed her bedroom door. Lee eventually told him to go downstairs and leave her door open. (Tr. II, 56.)

Lee testified that she was watching TV in bed when she heard noise like whispering. (Tr. II, 56-57, 60, 100.) When Lee went downstairs, she heard a rattling sound, like a belt buckle. She ran upstairs to check on the children and found that Tony was not in bed. (Tr. II, 57.) Tony was sleeping in Cameron's room that night so he could watch TV. (Tr. II, 59.) The other three children were on television restriction. (*Id*.) Lee went back downstairs and saw Tony in the living room

wearing a t-shirt, but no bottoms. (Tr. II, 57, 75-79.) Petitioner was waving his hands at Tony, trying to get him to go upstairs. (Tr. II, 57, 77.) Lee followed Tony and asked him what he was doing downstairs. Petitioner followed Lee and Tony up the stairs saying, "[D]id I touch you, why would you even - asking Little Tony, did I touch you, why would you even think that I would do something like that. Do I look like a molester?" (Tr. II, 57, 66.) Tony responded that Petitioner did not touch him. (Tr. II, 58, 66.) Lee grabbed her phone to call 911, but Petitioner knocked it out of her hand. (Tr. II, 58.) Lee told Petitioner that he better leave because she was calling the police. Petitioner ran out of the apartment and Lee dialed 911. (Tr. II, 58-59.) After Petitioner left, Lee asked Tony if Petitioner touched him and Tony responded, "yes." (Tr. II, 68.) Tony told her that "[Petitioner] put his private in [Tony's] butt." (Tr. II, 69.) Lee spoke to police for about ten minutes and then took Tony to the emergency room at Borgess. (Tr. II, 68, 107-08.) Lee did not tell the police some of the details she provided at trial, like Petitioner knocking the phone out of her hand, because she was in a hurry to take her son to the hospital. (Tr. II, 104.)

Lee testified that the night after, or within a few days of the incident, the kitchen window was broken in their apartment. (Tr. II, 87.) Lee, Bell and his cousin, Desmond, were at the apartment when they heard the glass shatter around 10:00 p.m. (Tr. II, 87-89.) Lee looked outside and saw Petitioner running away. (Tr. II, 90.) She called the police. (Tr. II, 92.) When Lee used her phone to call the police, she discovered a phone message from Petitioner saying, "I'm going to fucking kill you." (Tr. II, 93-94.) Lee was scared and believed Petitioner was threatening her because he did not want her to press charges against him for assaulting Tony. (Tr. II, 94.) Lee was so shaken up that she accidentally deleted the message, and, therefore, was unable to play it for the police. (Tr. II, 107.) Lee was able to show the police officer that she had received a call from

Petitioner's phone number.  (Tr. II, 107, 109.)  Lee, Bell and Desmond went to Petitioner's house to confront him about Tony on another day, but they did not threaten him.  (Tr. II, 97.)

Detective Richard Mattison of the Kalamazoo County Sheriff's Department testified that he was the lead investigator in the case.  (Tr. II, 113.)  Mattison testified that various items were collected for potential DNA evidence, including a rape kit, hair samples from the victim and a pair of the victim's underwear.  (Tr. II, 114-16.)  The results, including the rectal smear, all were consistent with the victim's DNA.  (Tr. II, 116, 122.)  A blanket also was collected as evidence, but was not submitted for DNA testing because the initial lab testing in Grand Rapids did not find anything on the blanket that could be submitted for purposes of comparison.  (Tr. II, 132-33.)  Mattison testified that the lack of physical evidence was not surprising in this type of case.  (Tr. II, 116.)  Mattison scheduled a forensic interview for Tony with the Children's Advocacy Center in Kalamazoo.  (Tr. II, 117.)  For sexual assault victims under 12, it was department  protocol for a forensically trained interviewer to conduct the interview rather than police. (*Id*.) Mattison observed the interview from another room.  (Tr. II, 120.)

Mattison testified that, based upon the victim's interview and the rest of the evidence gathered in Mattison's investigation, he submitted charges against Petitioner. (Tr. II, 118). Mattison also scheduled Plaintiff to have a second physical examination conducted by a pediatrician who is recognized as an expert in the area of forensic examination of sexual assault victims.  (*Id*.)  In addition, Mattison interviewed witnesses and family members regarding the incident.  Mattison testified that, "There was an indication that it may have happened prior to this incident at a different location," but he was unable to verify that information.  (Tr. II, 119.)  Mattison attempted to interview Petitioner, but an interview was not conducted.  (*Id*.)

Mattison testified on cross-examination that, during the forensic interview, Tony said that Petitioner came upstairs and woke him up; he did not say that Petitioner carried him down the stairs. (Tr. II, 121.) Lee did not mention anything to Mattison during his interview with her about Petitioner coming up to her room to have conversations before the alleged assault or Petitioner knocking the phone out of her hand when she tried to call the police. (Tr. II, 120.) Mattison testified that it was not unusual for victims and witnesses to provide additional details after the initial interview. He would only write a supplemental report if the new information was pertinent to the case. (Tr. II, 125.) Mattison testified that he would have included in his original report or created a supplemental report if Lee had told him that Tony was sleeping on the living room floor after the incident or that Petitioner knocked the phone out of Lee's hand. (Tr. II, 128-29.)

Deputy Clair Sootsman of the Kalamazoo County Sheriff's Department testified that she was dispatched for a reported criminal sexual conduct to 5610 Grassy Meadows, Apartment D at approximately 4:00 a.m. on May 28, 2008. (Tr. II, 135-36.) Sootsman was the first officer to arrive and speak with Lee. (Tr. II, 136-37.) Sootsman described Lee as excited and emotional; she was anxious to get her son to the hospital for medical attention. (Tr. II, 137.) Sootsman interviewed Lee for about ten minutes to get a quick synopsis of what had happened and a description of the suspect. (*Id.*) The prosecutor asked Sootsman what he did as a result of his conversation with Lee, to which Sootsman responded, "After I spoke with her we pretty much believed that a crime had been committed, and that our suspect was at an apartment within that complex." (Tr. II, 138.) Sootsman and other officers went to the apartment where Petitioner and his mother lived. (Tr. II, 139.) Sootsman looked through the sliding glass door on the back of the apartment and could see a black male fitting Petitioner's description laying on the couch. (Tr. II, 139-40.) When other

officers knocked on the front door, Sootsman saw the man jump up from the couch and run upstairs. (Tr. II, 140.) Sootsman could hear the man having a conversation with a woman. He told her that the police were at the door and not to let them in. The man also told the woman to tell them that he was not home. (Tr. II, 140-141.)

Deputy Michael Denoon of the Kalamazoo County Sheriff's Department testified that he was dispatched to 5610 Grassy Meadows between three and four in the morning on May 30, 2008. (Tr. II, 144.) When he arrived, Denoon discovered that the kitchen window of the residence was broken in from the outside. (Tr. II, 144-45.) The resident, Cassandra Lee, also reported receiving a threatening phone call. (*Id*.) Lee's cousin, Desmond Thompson, also was present in the apartment. (Tr. II, 145.) Lee showed Denoon the call history on her cell phone and the call that came in at 11:00 p.m. on May 29. (Tr. II, 145, 153-54.) Thompson also showed Denoon that the phone number of the caller on Lee's phone matched the number for Petitioner on Thompson's phone. (Tr. II, 146-47.) Denoon also believed that a call was made from Thompson's phone to Petitioner at 11:58 p.m. (Tr. II, 149.) Lee was upset and crying. Thompson also was upset and seemed worried for Lee. (Tr. II, 147.) Lee told Denoon that she was so upset after she received the voicemail message that she accidentally erased it. (Tr. II, 148.) Denoon learned that the suspect lived in the same apartment complex. The officers knocked on the door and a woman, who identified herself as the suspect's mother, said he was not home. (*Id*.) Denoon prepared a report and requested a warrant for Petitioner's arrest. (*Id*.) Denoon did not obtain Petitioner's cell phone records. (Tr. II, 150.) Denoon did not knock on doors or try to wake the neighbors to see if anyone had seen anything with regard to the broken window. (Tr. II, 151-52.) He did not believe that was necessary as Lee and Thompson both were certain that they saw Petitioner running from the scene.

(Tr. II, 152-53.) Denoon was aware of the recent criminal sexual conduct call to that apartment because he was one of the responding officers. (Tr. II, 154.)

Desmond Thompson testified that he was a cousin to Cassandra Lee and Tony Bell, Sr. (Tr. II, 156.) Petitioner was a long-time family friend. (*Id*.) On the night of May 30, 2008, Thompson was at Lee and Bell's apartment playing video games on the second floor when they heard a window break downstairs. (Tr. II, 157-58.) They ran downstairs and found that the kitchen window was broken. Thompson looked out the window and saw Petitioner running away. (Tr. II, 159.) Thompson was aware of the sexual assault allegations against Petitioner. In addition, Cassandra Lee played a voicemail she received that evening from Petitioner saying, "that once he got his check on Friday he would fucking kill her." (Tr. II, 160.) Thompson recognized Petitioner's voice on the message. (Tr. II, 162.) Thompson testified that Lee was crying and scared. (Tr. II, 160.) Thompson denied going to Petitioner's residence or threatening to beat him up for what he did to Tony. (Tr. II, 163.)

Dr. Collette Gushurst, a professor of pediatrics at Michigan Statute University, testified as an expert in the field of child abuse and neglect. (Tr. III, 23-24.) Gushurst examined Tony Bell on June 20, 2008. (Tr. III, 25.) Tony's mother brought him for the examination, but was not in the room when Gushurst took the history from Tony and conducted the examination. (Tr. III, 26-27.) Tony told Gushurst that something happened that caused him pain in his bottom. (Tr. III, 28.) Gushurst asked him if he could tell her more about that. Tony did not respond, so she started asking more detailed questions, like how many times did it happen. (*Id*.) Tony told her it happened twice, once when he was about nine-years-old and the second time when he was eleven-years old. (Tr. III, 28-29.) Tony further indicated that it was Brandon's "privates" that hurt him there and that

Brandon removed his clothing during the incidents. (Tr. III, 29, 33.) Gushurst took a culture from the anus area to check for sexually transmitted diseases, which involves inserting a culterette about a centimeter beyond the outside opening. (Tr. III, 29.) When Gushurst asked Tony if that is where he felt Brandon's private parts, Tony said, "deeper." Gushurst inserted the culterette a little further and asked him again, and Tony again responded, "deeper." (Tr. III, 29-30.) During the exam, Gushurst did not find any scars, fissures or signs of trauma in Tony's anal area. (Tr. III, 29-31.) Gushurst testified that they rarely have physical findings in cases of anal penetration. (Tr. III, 31-32, 35.) When Gushurst asked Tony if anyone had ever touched his penis, he said, "no." (Tr. III, 34.) The test results for sexually transmitted diseases were negative. (Tr. III, 37.)

Petitioner testified that he lived with his mother at 5856 Meadow Sweet Avenue, Apartment D. (Tr. III, 45.) Petitioner testified that Cassandra Lee was his cousin and that he had known her his entire life. He had known Bell since he was about nine-years-old. (*Id*.) Petitioner testified that Lee called to invite him over to her apartment at about 2:00 a.m. on May 28, 2008. (Tr. III, 45-46.) Petitioner believed that Lee invited him over to have a drink. (Tr. III, 46.) He brought vodka with him, but had not been drinking before his arrival. (*Id*.) When Petitioner arrived, Lee and Bell were drinking cans of beer. (Tr. III, 47.) Petitioner shared his vodka with Lee and Bell, who mixed the vodka with their beer. Petitioner testified that he only had a buzz from the alcohol. (*Id*.) He denied being drunk that night. (Tr. III, 66.) Petitioner left and went to a friend's house to look for his keys, but they weren't there. He didn't want to knock on the door and wake his mother, so he went back to Lee's apartment to spend the night. (Tr. III, 48, 67.) He had slept there dozens of times. (*Id*.) Petitioner denied that his mother locked him out that night. (Tr. III, 66.)

Petitioner testified that he was on the couch in the living room when Lee and Bell went upstairs to bed. Up to that point, he had not seen any of the children. (Tr. III, 49.) Petitioner never went upstairs after Lee and Bell went to bed. (Tr. III, 51, 73.) Petitioner went to sleep on the couch, but was awoken by Tony who asked him for money for school. (Tr. III, 50-51, 73-74.) Tony woke him up my shaking Petitioner's foot. (Tr. II, 73-74.) Tony was wrapped in a blanket. (Tr. III, 50.) Petitioner did not know what Tony was wearing under the blanket. (Tr. III, 55.) Petitioner was wearing drawstring pants with a belt and a button-up shirt. (Tr. III, 50-51.) Petitioner often gave Tony dollars to buy freeze cups at school. (Tr. III, 51-52.) Petitioner received his social security checks on the third day of the month. (Tr. III, 71.) When Petitioner stood up to go to the bathroom, he noticed that his pants were unzipped. (Tr. III, 52.) Petitioner was not sure how that had happened, but they weren't like that when he went to bed. (Tr. III, 53.)

Petitioner testified that he saw Lee coming down the stairs on his way to the bathroom. (Tr., 52.) He used the bathroom, and on the way back to the couch, he saw Lee looking in the refrigerator. Lee came up behind him and asked him where Little Tony was. Petitioner responded, "He's right here." There was something in Petitioner's way, so he pushed Tony forward a little bit in order to get to the couch. (*Id.*) Petitioner heard a lot of commotion upstairs. When he went up, he was accused of sexually assaulting Tony. (Tr. III, 54.) Petitioner was shocked and devastated by the accusation. He denied touching Tony or removing his clothing. (*Id.*) Petitioner asked Tony if he, Petitioner, had touched him, and Tony responded, "no." (*Id.*) Lee asked Petitioner to leave. Petitioner went home and his mother answered the door and let him in. (Tr. III, 55-56.) His mother was on the phone with Lee. (Tr. II, 80.) Petitioner testified that he was out hiding in the trunk of the car when deputies knocked on the door. (*Id.*) A couple of hours later, Petitioner's

mother called 911 because he would not let her in his room and she was afraid that he might hurt himself. (Tr. III, 84.) Petitioner was distraught and wanted to be alone, but he did not harm himself. (Tr. III, 89.)

Petitioner testified that Bell and his cousin, Desmond Thompson, orchestrated an ambush the following night. Thompson asked Petitioner to go the liquor store with him and then asked Petitioner to drive his car to an apartment complex. When Petitioner parked as directed by Thompson, an angry mob of about 11 people approached the car. (Tr. III, 56-60.) Bell punched Petitioner through the driver's window. Petitioner tried to put the car in reverse, but Thompson threw it in park and took the keys. (Tr. III, 60.) Petitioner was in fear for his life, so he got out of the car through the driver's door and ran away as fast as he could. No one pursued him. (*Id.*) Petitioner went home and told his mother about the incident. Shortly thereafter, there was a ring at the door. It was Lee, Bell, Thompson and two other men. (Tr. III, 61.) Petitioner stepped outside and was punched again by one of the men he did not know. Petitioner went back inside and the confrontation ended. (*Id.*) Petitioner suffered a busted lip, but did not report either of the assaults to the police because he was scared and did not want to have contact with the police. (Tr. III, 63, 85-86.) Petitioner left town to take care of his grandfather, who was sick and dying of cancer. (Tr. III, 63.) Petitioner denied threatening Lee or breaking her kitchen window. (Tr. III, 61-62, 85.) Petitioner also denied touching Tony's penis or putting his penis in Tony's anus. (Tr. III, 62-63.) Petitioner did not know any reason why Lee would falsely accuse him of sexually assaulting Tony. (Tr. III, 79.)

At the conclusion of trial, on January 20, 2009, the jury found Petitioner guilty of the two CSC offenses, but not guilty of the remaining offenses. (Tr. IV, 5-6.) On April 30, 2009,

Petitioner was sentenced as a fourth habitual offender to concurrent prison terms of 20 to 45 years for the CSC I conviction and 8 to 16 years and 8 months for the CSC II conviction. (Sentencing Transcript, (S. Tr.), 14-20, ECF No. 18.)

### B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on October 6, 2009, raised the same two issues as raised in this application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, ECF No. 19.) By unpublished opinion issued on October 7, 2010, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 10/7/10 Mich. Ct. App. Opinion (MCOA Op.), ECF No. 19.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court presenting the same two claims raised before and rejected by the Michigan Court of Appeals. By order entered March 8, 2011, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* 3/8/11 Mich. Ord., ECF No. 20.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on

the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

## **Discussion**

I. WAS [PETITIONER] DEPRIVED OF A FAIR TRIAL BY ERROR WHERE DEPUTY SOOTSMAN TESTIFIED THAT POLICE "PRETTY MUCH BELIEVED THAT A CRIME HAD BEEN COMMITTED" AND DETECTIVE MATTISON TESTIFIED THAT THE STATEMENTS OF

WITNESSES AND THE "ENTIRE INVESTIGATION" CAUSED HIM TO
SEEK CHARGES AGAINST [PETITIONER] WHERE THE ADMISSION
OF SUCH BELIEF INVADED THE PROVINCE OF THE JURY?

Petitioner claims that he was denied a fair trial when Detective Mattison and Deputy Sootsman provided improper opinion testimony regarding Petitioner's guilt. During direct examination of Detective Mattison regarding his investigation, the prosecutor asked:

> Q:     And was it based on everything that you had? The interview, the evidence, even that was lacking, the statements that were given to you by witnesses, your entire investigation that caused you to submit charges in this matter regarding Brandon Arnold?
>
> A:     Yes.

(Tr. II, 117-18.) Deputy Clair Sootsman testified that he was dispatched to the home of Cassandra Lee after she made a report concerning criminal sexual conduct. (Tr. II, 136.) He spoke with Lee and got a quick synopsis of what happened and a suspect description. (Tr. II, 137.) The prosecutor then asked him:

> Q:     As a result of talking to her, what did you do?
>
> A:     After I spoke with her we pretty much believed that a crime had been committed, and that our suspect was at an apartment within the complex.

(Tr. II, 138.) Petitioner maintains that the opinion testimony was particularly prejudicial in this case, where there was no physical evidence and the credibility of the complainant and the accused was paramount.

The Michigan Court of Appeals found Petitioner's claim unpreserved, but reviewed it for plan error, stating:

> On appeal, defendant first argues that testimony from one police officer that the "entire investigation" caused the police to "submit charges" against defendant, and from another officer that the police "pretty much believed that a crime had been

- 16 -

committed" were inadmissible statements of the officers' opinions that defendant was guilty. Defendant did not object to the challenged testimony at trial; therefore, the issue is not preserved. Unpreserved claims are reviewed for "plain error" affecting substantial rights. *People v Taylor* (On Remand), 252 Mich App 519, 523; 652 NW2d 526 (2002).

A witness opinion concerning the guilt or innocence of a criminal defendant is not admissible. *People v Moreno*, 112 Mich App 631, 635; 317 NW2d 201 (1981). The issue of an individual's guilt or innocence is a question solely for the jury. *People v Suchy*, 143 Mich App 136, 149; 371 NW2d 502 (1985).

Here, Detective Richard Mattison testified regarding his duties as the lead investigator of an alleged criminal sexual conduct case. Mattison testified that when he is assigned a case he becomes familiar with the case by interviewing witnesses, arranging for the collection and submission of evidence, interviewing suspects, and, at the end of the investigation, sending the case to the prosecutor's office if he believes there is enough for the matter to be submitted for criminal charges. Mattison further testified as to his duties in this specific matter, indicating that he completed a criminal sexual conduct kit with respect to the complaining witness, and scheduled a forensic interview with the complaining witness. The prosecutor asked if the officer put the details of the complaining witness' interview in his police report, then asked:

> And was it based on everything that you had? The interview, the evidence, even that was lacking, the statements that were given you by witnesses, your entire investigation that caused you to submit charges in this matter regarding Brandon Arnold?

Mattison simply responded, "Yes."

Clearly, the prosecutor did not ask the witness to comment on the guilt or innocence of defendant, and the detective's challenged statement concerned his involvement in the investigation and the general procedure followed - not whether he believed defendant to be guilty. Because Mattison expressed no opinion as to defendant's guilt or innocence, but merely provided evidence concerning his investigation, defendant's argument with respect to Mattison's testimony is without merit. The same holds true for defendant's challenge to Deputy Clair Sootsman's testimony.

Deputy Sootsman testified that he responded to the complaining witness' home on a report that a criminal sexual conduct occurred. Sootsman testified that upon his arrival, he made contact with the complainant, spoke to the complaining witness' mother, obtained a description of the suspect, and provided the information he received to other officers. The prosecutor asked, "As a result of talking to [the complainant's mother] what did you do?" Sootsman responded, "After I spoke with her we pretty much believed that a crime had been committed, and that our suspect

was at an apartment within that complex." As with the first officer, Sootsman was clearly detailing the process of the investigation and explaining how the charges came about. The admission of the testimony did not constitute plain error.

Moreover, even if the admission of the statements was erroneous, a review of the record establishes that the error did not affect defendant's substantial rights. Under the plain error rule, reversal is only warranted if the defendant is actually innocent or the error seriously undermined the fairness, integrity, or public reputation of the trial. *People v Pipes*, 475 Mich 267, 274; 715 NW2d 290 (2006). Where, as here, the officers' testimony that they believed a crime was committed, pursued the investigation, and sought charges, was evident from all the other evidence and inferences in the case. The record does not support a finding that the challenged statements unduly influenced the jury to convict defendant. It does not appear that the evidence had any bearing on the trial's outcome; thus, defendant has not demonstrated any plain error affecting substantial rights.

(MCOA Op. 1-3.)

Respondent contends that Petitioner's claim is procedurally defaulted because he failed to raise a contemporaneous objection in the trial court. When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks

to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

In this instance, the Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in applying the limited plain error standard of review to Petitioner's claim. It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir. 2011; *Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir. 2010); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Moreover, "plain error review does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice").

When a petitioner has procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack

of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Petitioner does not allege cause for his default. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). Petitioner also has not demonstrated that manifest injustice would result because he has not made a colorable claim of innocence; he has not shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent. *Schlup*, 513 U.S. at 322 (citing *Murray*, 477 U.S. at 495). This requires a showing "that 'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *Coleman v. Mitchell*, 244 F.3d 533, 540 (6th Cir. 2001) (quoting *Schlup*, 513 U.S. at 329). While Petitioner maintains his innocence, he has not offered any new evidence in support of his claim. Accordingly, I conclude that Petitioner's claim is procedurally defaulted.

Even if his claim was not procedurally defaulted, Petitioner would not be entitled to habeas corpus relief. In *Cooper v. Sowders*, 837 F.2d 284, 287 (6th Cir. 1988), the Sixth Circuit held that it was fundamentally unfair and a violation of due process to permit a detective to testify as an expert witness that all the evidence linked the petitioner, and no one else, to the crime. In that

case, a police officer testified that "[t]he only evidence we found that would link anyone to this crime would be [the defendant]."  *Id.*  The court noted that "the police officer was [impermissibly] permitted to testify to his own, personal opinion that such evidence as there was against other suspects was insufficient to justify their arrest . . . .  This opinion suggests to the jury the guilt of the accused and the innocence of other suspects."  *Id.*  (quotation marks omitted).  Consequently, the Sixth Circuit found that "[t]he opinion-testimony had a direct influence on the jury's consideration of petitioner's guilt or innocence."  *Id*. at 287.  The court found that the trial court committed error with regard to each of the petitioner's three grounds for relief, and when considered cumulatively, the errors produced a trial setting that was fundamentally unfair.  *Id*. at 288.

As an initial matter, this Court cannot grant Petitioner habeas relief on the basis of *Cooper*, as it does not constitute clearly established Supreme Court precedent for purposes of granting habeas corpus relief under the AEDPA.  See 28 U.S.C. § 2254(d).  Petitioner has failed to identify any Supreme Court case holding that the opinion testimony of a witness concerning the guilt or innocence of a criminal defendant violates the Due Process Clause.  Rather, Petitioner relied upon the decisions  of state courts, which cannot serve as the basis for habeas corpus relief.  In addition, *Cooper*, which was decided before the enactment of the AEDPA, granted habeas relief on the casis of cumulative error, which no longer is cognizable on habeas review.  "The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief."  *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002).

Moreover, *Cooper* has been distinguished by the Sixth Circuit and the federal district courts in many cases such as this where the law enforcement officer was not giving his opinion as an expert, but was simply explaining the course of the investigation that resulted in charges against

the petitioner. *See, e.g., United States v. Cobb*, 397 F. App'x 128, 133-35 (6th Cir. 2010) (Detective's testimony regarding the investigation and elimination of another suspect in the case did not violate due process as the testimony "was primarily fact-based rather than opinion-based and did not impermissibly suggest Cobb's guilt."); *Sanford v. Smith*, No. 2:11–CV–10748, 2013 WL 5913948, at *5 (E.D. Mich. Oct. 24, 2013) (distinguishing *Cooper*); *Dorsey v. Banks*, 749 F. Supp. 2d 715, 758-59 (S.D. Ohio 2010) (same). In this case, the complained of testimony was part of a fact-based explanation of the officers' investigation and conclusion that a crime had been committed, which would be true in any criminal prosecution. Petitioner, therefore, was not denied a fair trial as a result of the officers' testimony.

II.    WAS [PETITIONER] DEPRIVED OF A FAIR TRIAL BY PLAIN ERROR WHERE DETECTIVE MATTISON TESTIFIED THAT "THERE WAS AN INDICATION THAT IT MAY HAVE HAPPENED PRIOR TO THIS INCIDENT AT A DIFFERENT LOCATION," WHERE HE ADMITTED THAT HE WAS NOT "ABLE TO VERIFY ANY OF THAT"?

In his second ground for habeas corpus relief, Petitioner contends that he was denied a fair trial when Detective Mattison testified that Petitioner may have committed a previous sexual assault because the matter was not within Mattison's personal knowledge. After asking Mattison about his involvement in the case and the steps he took in the investigation, the prosecutor asked:

Q:    And did you have any other involvement in this matter?
A:    Interviews.  Attempted interviews.

Q:    Interviews with other witnesses or individuals who would have been there at the scene on the evening?

A:    That and family members.  There was an indication that it may have happened prior to this incident at a different location.

Q:    Okay.  Were you able to verify that?

A:        No.

(Tr. II, 118-19.)  Reviewing the claim only for plain error because it was not properly preserved in

the trial court, the Michigan Court of Appeals concluded that Petitioner's substantial rights were not

affected, stating:

> Defendant next contends that Detective Mattison's testimony that there was "an indication that it may have happened before" was inadmissible, because it was not based on the detective's personal knowledge. Again, defendant did not object to the challenged testimony at trial. As a result, we review this unpreserved claim for "plain error" affecting substantial rights. *Taylor (On Remand)*, 252 Mich App at 523.

> MRE 602 provides, in relevant part:

> > A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony.

> The prosecutor asked Mattison about his involvement in the investigation. Mattison testified that he conducted interviews and attempted interviews with witnesses and family members, and that "there was an indication that it may have happened prior to this incident at a different location." When asked if he was able to verify that information, Mattison indicated that he was not. The evidence that the detective questioned or tried to question others about an unsubstantiated hearsay allegation was irrelevant. MRE 401; MRE 402. In any event, the prosecutor did not ask about any other "incidents" such that Mattison's answer was unresponsive to the question asked. Given Detective Mattison's lack of personal knowledge and his inability to verify any prior incident, we agree the evidence was not admissible and its admission constituted plain error. That does not mean, however, that this error warrants reversal.

> Unresponsive testimony does not require reversal if the prosecutor does not conspire with or encourage the witness to give such testimony. *People v Hackney*, 183 Mich App 516, 531; 455 NW2d 358 (1990). The record here does not reflect that the prosecutor conspired with or encouraged the testimony. Moreover, reversal is warranted only when the error was plain error that affected defendant's substantial rights. *Taylor (On Remand)*, 252 Mich App at 523. There were no details regarding the other alleged incident, and the jury was informed that the other incident was not substantiated. The information was not repeated or emphasized during the course of the trial. Although the challenged testimony was unresponsive, irrelevant, and

- 23 -

admitted in error, on the record before this Court, we cannot conclude that defendant's substantial rights were affected.

(MCOA Op. 3.)

Like Petitioner's previous claim, his second ground for habeas relief is procedurally defaulted because he failed to make a contemporaneous objection at trial. Petitioner does not allege cause and prejudice for his default, or that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House*, 547 U.S. at 536. Consequently, his claim is barred from review by this Court.

Regardless of his default, Petitioner's claim clearly is without merit. To the extent Petitioner asserts a violation of MRE 602, it is well-established that this Court may not grant habeas relief on the basis of error in the application of state rules of evidence. *See Estelle v. McGuire*, 502 U.S. 62 (1991). An inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour*, 224 F.3d at 552 (quotation omitted); *accord Coleman*, 268 F.3d at 439; *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Petitioner cannot meet this difficult standard. As was the case with Petitioner's first ground for relief, Detective Mattison's reference to another possible incident occurred during the course of Mattison's factual account of his investigation. The complained of testimony was

relatively brief and vague. Mattison testified that he was unable to verify the report and the prosecutor did not pursue the matter any further. Consequently, the Court cannot find that Mattison's testimony deprived Petitioner of a fundamentally fair trial.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Dated: July 25, 2016    /s/ Phillip J. Green
Phillip J. Green
United States Magistrate Judge



### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).